UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTY SCHWADE,

      Plaintiff,

v.                                  CASE NO.: 8:10-cv-2436-T-23MAP

TOTAL PLASTICS, INC.,

      Defendant.

_____/

## **ORDER**

      Kristy Schwade sues her former employer, Total Plastics, Inc., for healthcare

benefits under an Employee Retirement Income Security Act ("ERISA") plan.  Arguing

that Schwade failed to exhaust administrative remedies, that the suit is time-barred, and

that Schwade violated the plan by refusing to sign a subrogation agreement, Total

Plastics moves (Doc. 20) for summary judgment.

I.

A.

      Schwade noticed one day in May, 2007, that something was profoundly wrong

with her five-month-old son, K.S., after he returned from daycare.  Although precisely

what happened to him remains unspecified, K.S.'s symptoms were consistent with

"shaken baby syndrome."  The daycare provider later pleaded guilty to aggravated child

abuse.  Having suffered catastrophic brain damage, K.S. remained in the hospital more than two months and required continuous medical attention thereafter.  K.S. died at the age of four in January, 2011.

B.

At the time of K.S.'s injury, Schwade participated in Total Plastics's self-funded ERISA employee health benefit plan ("the Plan"), of which K.S. was a beneficiary.  K.S. is eligible for as much as a million dollars in benefits – if Schwade fulfills the necessary conditions under the Plan.

The Plan's summary includes a detailed subrogation agreement that entitles the Plan to recover "[a]ny amount from the first dollar that the [participant] . . . is entitled to receive as a result of [an] Accident, Illness, or Injury or other medical condition, to the full extent of benefits paid or provided by the Plan."  (Doc. 20, Ex. 5 at 60)  Additionally, the Plan requires a participant to "execute documents (including a lien agreement) and deliver instruments and papers and do whatever else is necessary to protect the Plan's [subrogation] rights."  (Doc. 20, Ex. 5 at 60)  If the participant refuses to sign a supplemental subrogation agreement after submitting a claim, "the Plan has no obligation to make any payment for any treatment required as a result of the act or omission of any Other Party."  (Doc 20, Ex. 5 at 60)

Under the Plan, "[e]ach time a claim is submitted . . . the Covered Person will receive an Explanation of Benefits [] form that will explain how much the Plan paid toward the claim."  (Doc. 20, Ex. 5 at 69)  The Plan summary lists many reasons the

Plan administrator might deny a claim, including "[e]nforcement of subrogation" and failure to "respond to a request for additional information needed to process the claim." (Doc. 20, Ex. 5 at 69-70)  As to "additional information," the Plan summary further provides, "Determination Period on Hold: . . . . When claims information is missing, a notice requesting the necessary information will be sent to the Covered Person.  The Covered Person then has 45 calendar days within which to provide the missing information."  (Doc. 20, Ex. 5 at 69)  After forty-five days without the information from the participant, the Plan administrator may deny the claim.

If the Plan administrator denies a claim, under the Plan a participant will receive "[a] claim denial notice, usually referred to as an Explanation of Benefits" that "explain[s] the specific reasons for the denial," "provide[s] a specific reference to pertinent Plan provisions on which the denial was based," and "[p]rovide[s] appropriate information as to the steps the Covered Person can take to submit the claim for appeal."  (Doc. 20, Ex. 5 at 70)  If a participant wishes to challenge a claim denial, the Plan summary requires that the employee "file the appeal within 180 days of the date [she] received the Explanation of Benefits [] form from the Plan showing that the claim was denied."  (Doc. 20, Ex. 5 at 70)  The Plan summary states that a participant may sue "[a]fter completing all mandatory appeal levels through this Plan," but that "[n]o such action may be filed against the Plan after three years from the date the Plan gives the Covered Person a final determination on their appeal."  (Doc. 20, Ex. 5 at 72)

C.

The Plan paid between $26,000 and $35,000 of K.S.'s initial medical expenses, until in late June, 2007, about two months after K.S.'s injury, the Plan administrator sent Schwade a supplemental subrogation agreement.  This document informs that the Plan administrator cannot process a claim without "additional information" about K.S.'s injury. After a short questionnaire, the document states that the Plan may "recover payments from ANY settlement due [a participant or beneficiary] when the accident or illness is a result of negligence . . . ."  (Doc. 20, Ex. 6) (caps in original)  The document closes with a warning that "FAILURE OR REFUSAL TO EXECUTE THIS DOCUMENT RELIEVES THE PLAN OF ANY AND ALL LEGAL, FINANCIAL OR CONTRACTUAL OBLIGATION FOR ANY EXPENSES INCURRED BY THE PARTICIPANT."  (Doc. 20, Ex. 6) (caps in original)  Because Schwade never returned the supplemental subrogation agreement, the Plan administrator stopped paying K.S.'s claims.  Explanations of benefits sent to Schwade between August and November, 2007, state, "[w]e need updated accident information to process your claim.  Please call [phone number] or visit [website]."  E.g. (Doc. 20, Ex. 9)  The claims requiring "updated accident information" accrued between May and August 10, 2007, and embody the money Schwade seeks in this action.  For a claim that accrued after August 10, 2007, the explanations of benefits state, "[c]harges incurred after the date coverage ends are not covered."  After Schwade quit her Total Plastics job in August, 2007, to attend to K.S., Florida's Medicaid program provided

money for K.S.'s care.  Schwade concurs that Medicaid covered claims accruing after August 10, 2007.

In June, 2008, Schwade's attorney sent the Plan administrator a letter asking for information.  A June 18th response from the Plan administrator is insistent:

> [W]e need additional information from the member, [Schwade,] before we can determine benefits.  Please have [Schwade] sign the attached Subrogation Agreement and return to us . . . . [P]er [the subrogation provision in the Plan summary] this needs to be signed before we can determine benefits.

(Doc. 3, Ex. 4)  The attached subrogation agreement again warns that a failure to sign the agreement voids the Plan's obligations to Schwade.  A July 1st letter from the Plan administrator quotes the subrogation provision of the Plan summary and states, "At this time no additional charges will be considered until the Subrogation Agreement is received."  (Doc. 3, Ex. 5)

Ignoring the Plan summary, the warnings of the Plan administrator, and the impending legal consequences to Schwade if she failed to sign a subrogation agreement, Schwade's attorney in a July 24, 2008, letter complains that "[t]he sole reason" for the absence of claim payments is "Schwade['s] not signing a boiler plate subrogation agreement."  (Doc. 3, Ex. 6)  Schwade's attorney dismissed the Plan's "subrogation language" as "totally unacceptable" and declined on behalf of Schwade to sign.

In a November 4, 2008, letter, Schwade's attorney claims that the subrogation requirement "appear[s] to prohibit any civil action on K.S.'s behalf because it purports to

provide that the Plan would be reimbursed first and in full . . . ."  Schwade's attorney

offers a deal (and a threat): "We propose that the Plan and [K.S.] share equally (50/50

split) in whatever recovery is obtained after payment of the costs and attorney fees . . . .

Without the foregoing agreement, the Plan and Total Plastics essentially has [sic] no

chance of a recovery."  (Doc. 3 Ex. 7)  A March 12, 2009, letter repeats the offer

allowing the plan half an award – half, that is, of what remains after Schwade's attorney

receives remuneration in full.  Finally, a December 14, 2009, letter states:

> [T]he demand for our clients to sign a subrogation agreement that
> would only benefit Total Plastics without any attorney compensation
> or reimbursement for the costs was and remains totally
> unacceptable.  I find it hard to believe that such subrogation
> language is valid under ERISA and [that] the subject "subrogation
> agreement" is required before the [medical] providers are paid.

(Doc. 3, Ex. 9)

Without an agreement with the Plan, Schwade sued the daycare provider, the

daycare center, and others.

D.

Tampa General Hospital, which treated K.S., sued (Doc. 2) Schwade for more

than $600,000.  (Doc.2)  Schwade removed to federal court and in November, 2010,

submitted a third-party complaint (Doc. 4) against Total Plastics.  A January, 2011,

order (Doc. 12) remands Tampa General's action against Schwade but retains

Schwade's action against Total Plastics.  Although her benefits are capped at a million

dollars, Schwade sues Total Plastics for more than $1.4 million in expenses allegedly

owed under the Plan.

Total Plastics argues (1) that the Plan empowers the Plan administrator to require Schwade to sign a subrogation agreement; (2) that, because Schwade failed to appeal within the Plan's 180-day limitation, Schwade failed to exhaust her administrative remedies; (3) that Schwade failed to plead exhaustion in the complaint; and (4) that Schwade failed to sue within the Plan's three year limitation.[1]  Schwade responds to Total Plastics's arguments and counters that she is entitled to benefits without a subrogation agreement because signing a subrogation agreement (1) conflicts with Florida's Medicaid law, (2) results in unfairness, and (3) inhibits Schwade's ability to sue those responsible for K.S.'s injury and death.

II.

Asserting that "questions of fact exist," Schwade argues as if this action is subject to the typical summary judgment standard.  (Doc. 25 at 3)  However, the primary issue is the reasonableness of the Plan administrator's decision.  Epolito v. Prudential Ins. Co. of America, 737 F.Supp.2d 1364, 1369-70 (M.D. Fla. 2010) (Howard, J.).  If an ERISA plan fails to grant the plan administrator discretion to decide a claim and construe the plan, "the district court [] determin[es] de novo whether the administrator's decision was wrong rather than whether there are questions of material fact and whether the parties are entitled to judgment as a matter of law."  Murray v. Hartford Life & Acc. Ins. Co., 623

---

[1] Also, Total Plastics responds to an allegation in the complaint that Schwade need not re-pay the Plan until she is made whole.  Because the Plan summary explicitly rejects the "make whole" doctrine, Total Plastics may demand subrogation from Schwade even if Schwade is not first "made whole."  See Cagle v. Bruner, 112 F.3d 1510, 1521 (11th Cir. 1997).  In any event, Schwade abandons the argument in her response.

F.Supp.2d 1341, 1349 (M.D. Fla. 2009) (Conway, J.).  Alternatively, if an ERISA plan

grants discretion to the plan administrator to decide a claim and construe the plan, the

plan administrator is entitled to deference, in which instance "summary judgment is

simply a vehicle for deciding the issue and the non-moving party is not entitled to the

usual inferences in its favor."  D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co.,

640 F.3d 27, 34 (1st Cir. 2011); Blankenship v. Metropolitan Life Ins. Co., 644 F.3d

1350, 1354 & n.4 (11th Cir. 2011).

     The Total Plastics Plan grants the administrator "full and sole discretion[]" to

interpret the Plan and decide a benefit claim.  (Doc. 20, Ex. 5 at 3)  The next question is

how much discretion a Plan administrator is allowed.  Schwade's attorney misguidedly

argues (Doc. 25 at 14) for a "heightened arbitrary and capricious" standard that the

Eleventh Circuit has discarded.  See Doyle v. Liberty Life Assur. Co. of Boston, 542

F.3d 1352, 1359-60 (11th Cir. 2008).  Instead:

> For a court reviewing a plan administrator's benefits decision, the
> present [] test goes this way:
>
> (1) Apply the de novo standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (i.e., the court
> disagrees with the administrator's decision); if it is not, then end the
> inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then
> determine whether he was vested with discretion in reviewing claims;
> if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was
> vested with discretion in reviewing claims, then determine whether
> "reasonable" grounds supported it (hence, review his decision under
> the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship, 644 F.3d at 1355.

A conflict of interest exists because Total Plastics both decides claims and pays part of the benefits under the Plan.[2] See Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 112-13 (2008); Corkill v. Hartford Life and Accident Ins. Co., 435 F.Supp.2d 1192, 1197 (N.D. Fla. 2005) (Vinson, J.).  Although this conflict is "a factor" in step six, "the burden remains on the plaintiff to show [a] decision was arbitrary."  644 F.3d at 1355; Murray, 623 F.Supp.2d 1341 at 1352.  The distinction is not important in this instance because no issue in this action requires analysis at step six.

III.

On the one hand, as explained earlier, Schwade is subject to the subrogation provisions of the Plan.  On the other, Section 409.910(6), Florida Statutes, ensures that Florida's Medicaid program "automatically" enjoys an absolute subrogation right as to "any third-party benefit for the full amount of medical assistance provided by Medicaid."

---

[2] Total Plastics claims that a third-party, Fiserv Health, determined benefits, but the Plan summary names Total Plastics as the Plan administrator and the Plan summary empowers only the Plan administrator to determine benefits.  (Doc. 20, Ex. 5 at 2-3)  The Plan summary states that Fiserv Health merely "provides ministerial administrative services such as claim payments and enrollment."  (Doc. 20, Ex. 5 at 2)

See Russell v. Agency for Health Care Admin., 23 So.3d 1266 (Fla. 2d DCA 2010);

Agency for Health Care Admin. v. Estabrook, 711 So.2d 161 (Fla. 4th DCA 1998).

Hence, if Schwade recovers money in the suit against the daycare provider, the daycare

center, and others, both the Plan and Florida's Medicaid program hold a subrogation

right against the award.  Schwade argues that she is entitled to benefits even though

she never signed the Plan's subrogation agreement because (1) the Plan's requiring

Schwade to sign was unfair and unreasonable, and (2) Schwade was unable to sign

and is excused from signing because of the subrogation obligation toward Florida's

Medicaid program.

A.

Schwade should not "find it hard to believe," as Schwade's response claims, that

the Plan includes a comprehensive subrogation clause as well as a requirement that an

employee sign an additional subrogation agreement after an injury.  ERISA does not

"mandate what kind of benefits employers must provide if they choose to have [an

ERISA benefits] plan," and "employers have large leeway to design . . . welfare plans as

they see fit."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833 (2003).

Unsurprisingly, many ERISA benefit plans include a sweeping grant of subrogation.

See, e.g., Zurich Am. Ins. Co. v. O'Hara, 604 F.3d 1232, 1236-38 (11th Cir. 2010);

Admin. Comm. of Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan v. Shank, 500

F.3d 834, 838 (8th Cir. 2007); Waller v. Hormel Foods Corp., 120 F.3d 138, 139-40 (8th

Cir. 1997) ("A subrogation provision affects the level of benefits conferred by the plan,

and ERISA leaves that issue to the private parties creating the plan"); Ryan by Capria-Ryan v. Fed. Express Corp., 78 F.3d 123, 127 (3d Cir. 1996) ("ERISA [does not] bar [subrogation] clauses or otherwise regulate their content"); Cutting v. Jerome Foods, Inc., 993 F.2d 1293 (7th Cir. 1993); Trident Reg'l Health Sys. v. Polin, 948 F.Supp. 509, 511-19 (D.S.C. 1996).  A subrogation provision in a plan summary is, in a word, standard.

An ERISA plan utilizes a subrogation agreement for a good reason.  Recoupment of plan expenditures is "crucial to the financial viability of self-funded ERISA plans." Shank, 500 F.3d at 838; O'Hara, 604 F.3d at 1238.  Holding that an ERISA plan may demand that an employee "sign [the plan's] standard subrogation agreement before paying benefits," the Eleventh Circuit explains:

> Once benefits are paid, participants and beneficiaries have little incentive (other than the fear of a lawsuit) to sign a subrogation agreement.  If [a plan] cannot require the agreement beforehand, it often will have to resort to lawsuits or at least the threat of lawsuits to obtain the agreements.  Lawsuits cost money, sometimes a lot of it . . . . In short, having the agreement in hand before paying benefits provides significant protection to trust assets.

Cagle v. Bruner, 112 F.3d 1510, 1520 (11th Cir. 1997).  "While [the participant] is exclusively concerned with her own benefits, [the plan] is concerned with the benefits of all [] employees," Trident, 948 F.Supp. at 519; O'Hara, 604 F.3d at 1237; a subrogation agreement furthers the salutary purpose of ensuring that the plan administrator preserves the plan's assets for the totality of the plan's members.

Schwade offers no persuasive justification for failing to sign the subrogation agreement, or rather, offers no justification that allows Schwade to alter the terms of the Plan and collect benefits in this action.  First and most obviously, an attorney cannot hold his client's welfare and the plan's welfare hostage for the sake of attorney fees. For example, a party before the Third Circuit in <u>Ryan</u> won a tort suit against a third-party and asserted an entitlement to attorney fees ahead of an ERISA plan's subrogation right.  The Third Circuit was unimpressed:

> The [plaintiffs'] argument that the Plan would be unjustly enriched if it was not required to pay a pro rata share of their attorney's fees is entirely without merit.  Enrichment is not 'unjust' where it is allowed by the express terms of the plan . . . . Indeed, it would be inequitable to permit the [plaintiffs] to partake of the benefits of the Plan and then, after they had received a substantial settlement, invoke common law principles to establish a legal justification for their refusal to satisfy their end of the bargain.

<u>Ryan</u>, 78 F.3d at 127-28 (citations and quotations omitted); <u>see</u> <u>also</u> <u>O'Hara</u>, 604 F.3d at 1238.  Through her attorney, Schwade gambled – and bluffed – when claiming that no suit against the daycare parties could occur without a fifty-fifty-after-attorney-fees deal.  After the Plan stood firm Schwade sued the daycare parties anyway.  Besides, even if Schwade were correct, and further, even if the deal were fair to the Plan and the Plan's other members, "courts have no right to torture [an ERISA plan's] language in an attempt to force particular results."  <u>Hunt v. Hawthorne Assocs., Inc.</u>, 119 F.3d 888, 911 (11th Cir. 1997).  "To the exact contrary, straightforward language in an ERISA-regulated [plan] should be given its natural meaning."  119 F.3d at 911.

The Plan summary unambiguously entitles the Plan to a subrogation agreement from Schwade.  Without a subrogation agreement, the Plan summary unambiguously entitles the Plan not to pay Schwade's claims.  By attempting to drive a hard bargain with an ERISA plan for attorney fees, Schwade violated the existing bargain and left K.S. with no benefits.  (Schwade objects that, because she holds no settlement, this action differs from an action such as Ryan, in which an employee holding a settlement seeks to evade a plan's subrogation right.  The distinction is meaningless.  A request for court-sanctioned alteration of the plan is equally untenable before and after an employee settles with an at-fault third-party – no advantage accrues from plotting ahead of time to breach the plan.)

A plea that "fairness" requires re-writing the Plan fails.  Worrying that the daycare parties can pay little in damages, Schwade claims to pursue merely "a fair and equitable distribution of any money that may be recovered in the future."  (Doc. 25 at 2)  However, the Plan seeks not a windfall but only the re-imbursement of money paid (or money the Plan would pay after execution of the subrogation agreement).  Money from the Plan is partly an expense of Schwade's former fellow employees, and the Plan must remain financially sound to help other employees pay for medical hardship.  See O'Hara, 604 F.3d at 1238.  Importantly, again, the Plan's subrogation right "is not 'unjust' where it is allowed by the express terms of the plan."  Ryan, 78 F.3d at 127.

The responsibility of a participant to re-pay the Plan, even from a meager recovery, helps to maintain a manageable price for the Plan (and thus to maintain the

existence of the Plan).  Consequently, ERISA avoids dictating the correct balance between each participant's responsibilities and the cost of a plan.  Cf. <u>Kennedy v. Conn. Gen. Life Ins. Co.</u>, 924 F.2d 698, 699, 702 (7th Cir. 1991) ("[w]hether full indemnity is preferable to a co-payment system [in an ERISA plan] is a question for the marketplace"); <u>Hozier v. Midwest Fasteners, Inc.</u>, 908 F.2d 1155, 1160 (3d Cir. 1990) ("Congress was forced to balance its desire to regulate [ERISA] plans more extensively against the danger that increased regulation would deter employers from creating such plans in the first place").  In any event, a rule allowing a participant an extra-contractual award from a plan because of the difficulty of an individual case is unworkable. ERISA's "repeatedly emphasized purpose" is "to protect contractually defined benefits." <u>Mass. Mut. Life Ins. Co. v. Russell</u>, 473 U.S. 134, 148 (1985).  A "hardship" exception implied into each ERISA plan subrogation provision would transgress ERISA's purpose and facilitate plan-crippling litigation.  See <u>Cagle</u>, 112 F.3d at 1520.  Most plan participants who suffer a tort suffer a hardship, and some of the parties that commit a tort lack money.  Many victims, such as Schwade, want to sue to escape the obligation to re-pay the plan.  Even if the plan always won, case-by-case litigation of "hardship" would drain a plan's assets (that is, transform money for medical care into money for a lawyer).  Requiring Schwade to follow the Plan's requirement and sign a subrogation agreement is both "fair" and necessary.

B.

Schwade argues that Florida's Medicaid law blocks Schwade from signing the subrogation agreement.  One short response to this claim is that the Plan may stand on the plain language of the Plan summary.  <u>See</u> <u>Hunt</u>, 119 F.3d at 911.  No signed subrogation agreement, no benefits.  Another response is that Schwade's refusal to sign the subrogation agreement was not the result of Schwade's concern for Florida's Medicaid program or governing law.  Schwade's attorney wrote:

> We propose that the Plan and [K.S.] share equally (50/50 split) in whatever recovery is obtained after payment of costs and attorney fees.  As mentioned [earlier], this case is further complicated because [K.S.] also received Medicaid benefits, which under Florida law is granted the right to recover the benefits it paid.  I do not know but expect that Medicaid's recovery rights would be primary to any insurance subrogation claims.  Accordingly, any division between [K.S.] and the Plan would be secondary to any other liens which may take priority.

(Doc. 3, Ex. 7)  Schwade rejected the subrogation agreement as unfair and as counterproductive, but not as a violation of Florida's Medicaid law, about which Schwade's attorney professed ignorance ("I do not know . . .").

Florida law and federal law ensure payment priority for Medicaid.  Under 42 U.S.C. § 1396a(25)(H) a state must require that a state Medicaid program "acquire[s] the rights of [a Medicaid recipient] to payment by any other party for [] health care" paid by Medicaid.  <u>See also</u> 29 U.S.C. § 1144(b)(8) (excepting from ERISA's pre-emption a state cause of action that furthers Medicaid re-imbursement); 42 U.S.C. § 1396k(a)(1)(A) (directing a state to require each Medicaid recipient to assign the state

- 15 -

"any rights . . . to support . . . and to payment for medical care from any third party");
29 U.S.C. § 1169(b).  Under Section 409.910(13), Florida Statutes, no action of a
Medicaid recipient can prejudice the re-imbursement right of the Florida Medicaid
program.  As Schwade correctly noted, Medicaid recovery trumps the fulfillment of "any"
private subrogation agreement.  "In Florida, a Medicaid recipient entering into a
settlement of a tort claim with a third party does so against the backdrop" of the
subrogation right of Florida's Medicaid program.  Russell, 23 So.3d 1266, 1269.
Schwade understood that an agreement between Schwade and the Plan to pay
Schwade's attorney first would leave an enforceable, senior lien in favor of Medicaid.
Schwade fails to explain why the same is not true of an agreement between Schwade
and the Plan to devote any recovery in Schwade's lawsuit to the Plan until the Plan is
re-paid.

No further discussion is necessary on the Plan's refusal to pay the benefit without
a subrogation agreement.  The refusal was "de novo correct" under the terms of the
Plan summary.  See Blankenship, 644 F.3d at 1355.

IV.

The consequence of Schwade's failure to sign a subrogation agreement depends
on whether Schwade failed to exhaust her administrative remedy.

A.

As Total Plastics notes, a plaintiff should plead exhaustion of the administrative
remedy.  Byrd v. MacPapers, Inc., 961 F.2d 157, 160-61 (11th Cir. 1992); In re

<u>Managed Care Litigation</u>, 595 F.Supp.2d 1349, 1353 (S.D. Fla. 2009) (Torres, Mag. J,

<u>adopted</u> <u>by</u> Moreno, J.) (citing <u>Byrd</u>); <u>Nat'l Renal Alliance, LLC v. Blue Cross and Blue</u>

<u>Shield of Ga., Inc.</u>, 598 F.Supp.2d 1344, 1356 (N.D. Ga. 2009) (Forrester, J.) (citing

<u>Byrd</u>).  The complaint alleges that "[a]ll conditions precedent to this action has [sic] been

fulfilled, waived, or have otherwise occurred" (Doc. 3 at 12), but "pleading that 'all

conditions precedent have been satisfied' or that all 'such conditions have been waived

or excused' is not sufficient." <u>Bacon v. Stiefel Labs., Inc.</u>, 677 F.Supp.2d 1331, 1338

(S.D. Fla. 2010) (King, J.) (quoting <u>Variety Children's Hosp. v. Century Medical Health</u>

<u>Plan</u>, 57 F.3d 1040, 1042 n.2 (11th Cir. 1995)); <u>C.P. Motion, Inc. v. Aetna Life Ins. Co.</u>,

268 F.Supp.2d 1346, 1348 (S.D. Fla. 2003) (Ungaro-Benages, J.).  But, because the

complaint alleges in detail the letters exchanged between Schwade and Total Plastics,

the complaint includes just enough for a reasonable reader to infer exhaustion of

Schwade's administrative remedy.

B.

A reasonable limitation in an ERISA plan is enforceable.  <u>Northlake Reg'l Med.</u>

<u>Ctr. v. Waffle House System Emp. Benefit Plan</u>, 160 F.3d 1301, 1303 (11th Cir. 1998).

Total Plastics argues that Schwade's suit is barred because "she waited more than

three years after the date she terminated her participation in the Plan . . . to [sue]."

(Doc. 20 at 15)  The limitation in the Plan summary says nothing about an employee

ceasing participation in the Plan.  Rather, the limitation bars an action against the Plan

more than "three years from the date the Plan gives the Covered Person a final

- 17 -

determination on their appeal." (Doc. 20, Ex. 5 at 72)  Total Plastics, apparently without

a sense of contradiction, admits in the paragraph arguing that the action is barred that

"Schwade never appealed." (Doc. 20 at 15)

The Plan's limitation governs cases in which the participant appeals and receives

a disposition of the appeal from the Plan administrator.  If a participant fails to appeal,

the pertinent limitation in the Plan summary is the 180-day time limit for submitting an

administrative appeal.

C.

A plaintiff may not sue in federal court until the administrative remedy enumerated

in an ERISA plan summary is exhausted.  E.g., Lanfear v. Home Depot, Inc., 536 F.3d

1217, 1223-24 (11th Cir. 2008); Bickley v. Caremark RX, Inc., 461 F.3d 1325, 1328

(11th Cir. 2006); Watts v. BellSouth Telecommunications, Inc., 316 F.3d 1203, 1204,

1207 (11th Cir. 2003).

The exhaustion requirement is "strictly enforce[d] . . . with certain caveats

reserved for exceptional circumstances."  Perrino v. Southern Bell Tel. & Tel. Co., 209

F.3d 1309, 1315 (11th Cir. 2000).  The "exceptional circumstances" are "when resort to

administrative remedies would be futile or the remedy inadequate [and] where a

claimant is denied 'meaningful access' to the [plan's] administrative review scheme."

Perrino, 209 F.3d at 1316; see also Watts, 316 F.3d at 1207 (adding an exception for a

claimant's reasonable misinterpretation of the plan summary).  In Perrino, the plan

participants argued "that exhaustion should not be required where an ERISA plan fails

- 18 -

to comply in full with all ERISA regulations."  209 F.3d at 1315.  <u>Perrino</u> rejects the idea

that a "technical deficiency" in a plan's claim procedure automatically justifies a waiver

of the exhaustion requirement:

> Our prior precedent makes clear that the exhaustion requirement for
> ERISA claims should not be excused for technical violations of
> ERISA regulations that do not deny plaintiffs meaningful access to
> an administrative remedy procedure through which they may receive
> an adequate remedy.  For instance, in [<u>Counts v. American General
> Life and Accident Insurance Company</u>, 111 F.3d 105, 107 (11th Cir.
> 1997)], the plaintiff argued that the district court erred in not excusing
> the exhaustion requirement because his employer's termination letter
> failed to comply precisely with ERISA's notice requirements under 29
> U.S.C. § 1133 and 29 C.F.R. § 2560.503-1(f).  The district court
> acknowledged that the termination letter was technically deficient in
> some respects, but concluded that "the letter substantially complied
> with the notice requirements because, taken as a whole, it supplied
> Counts with a statement of reasons that, under the circumstances of
> the case, permitted a sufficiently clear understanding of the
> administrator's position to permit effective review."
>
> On appeal, we affirmed the district court's application of the
> exhaustion requirement despite the employer's noncompliance with
> the ERISA notice provision . . . .  The clear import of our decision was
> the conclusion, that though employees should not have their ERISA
> claims adversely affected by an employer's technical noncompliance
> with ERISA regulations, so too, they should not be able to avoid the
> exhaustion requirement where technical deficiencies in an ERISA
> claims procedure do not hinder effective administrative review of
> their claims.

<u>Perrino</u>, 209 F.3d at 1317-18 (citations and footnote omitted); <u>see</u> <u>also</u> <u>Lacy v. Fulbright</u>

<u>& Jaworski</u>, 405 F.3d 254, 256-57 (5th Cir. 2005) ("[a]t least seven [] federal appeals

courts . . . [hold] that substantial rather than strict compliance with ERISA § 1133 and

DOL Regulation § 2560.503-1(f) is all that the law requires.  We join those courts

today . . . ."); <u>Terry v. Bayer Corp.</u>, 145 F.3d 28, 39 (1st Cir. 1998) ("ERISA notice

requirements are not meant to create a system of strict liability for notice failures");

Heller v. Fortis Benefits Ins. Co., 142 F.3d 487, 492-93 (D.C. Cir. 1998).

The Plan administrator's processing of Schwade's claims included two defects. First, under the Plan summary the Plan administrator could not deny Schwade's claims for lack of additional information until August 12, 2011, forty-five days after June 28, 2007, the date on the proposed subrogation agreement that Schwade never signed. Yet, as Total Plastics admits, "[t]he first [Explanation of Benefits] showing a denial of benefits . . . is dated August 8, 2007." (Doc. 20 at 9) Hence, Total Plastics prematurely denied some claims in violation of the Plan's "Determination Period on Hold" provision. Second, no explanation of benefits sent to Schwade cites a specific Plan provision that undergirds the claim decision, as is required by both the Plan summary and 29 C.F.R. § 2560.503-1(g) in the Department of Labor's ERISA regulation.

The deficiencies in the Plan administrator's claim denials "are technical deficiencies in an ERISA claims procedure [that] do not hinder effective administrative review" of Schwade's claims. Perrino, 209 F.3d at 1318. In November, 2007, Schwade had the subrogation agreement, which requested additional information, and Schwade had the explanations of benefits that denied her claims. Although devoid of a statement equivalent to "Your claim is denied," each explanation conveys unmistakably that the Plan refused to pay a claim – costs are listed under "Amount Not Payable" and "Provider May Bill You." Although each explanation of benefits fails to cite a provision in the Plan summary, each explanation of benefits states, as the reason for the denial, that

Schwade needed to provide "updated accident information."  Because Schwade had the

proposed subrogation agreement that stated "I am unable to process this claim without

additional information from you," followed by a questionnaire, Schwade could know

easily – even without contacting the Plan administrator – the additional information

required.  In any event, each explanation of benefits states "YOUR IMMEDIATE

RESPONSE IS REQUIRED" (caps in original) and provides in several places

information on contacting the Plan administrator.  Each explanation of benefits advises

how to appeal a claim denial and warns that an appeal must occur within one hundred

eighty days.  In sum, the explanations of benefits were ample notification that the Plan

had denied claims and that an appeal was due within a stated time.  The only

detectable defects were the absence of a citation to the Plan provision on which the

denial was based and the four-days' premature denial of a few claims – "technical

defects" that in no way "hinder[ed] effective administrative review" for Schwade.  By

June, 2008, when Schwade's atttorney sent a letter, the 180-day window to appeal was

closed.  Schwade failed to exhaust her administrative remedy.

Schwade states, "[a]lternatively, given the Plan's behavior, any further effort by

[Schwade] to communicate with the Plan or resort to the administrative process would

[have been] futile."  (Doc. 25 at 16)  First, other than the two "technical deficiencies," the

Plan administrator acted in accord with the terms of the Plan.  Second, a futility

argument is closed to Schwade because Schwade needed to at least attempt to pursue

an administrative remedy.  See Lanfear, 536 F.3d at 1225.  Third, "bare allegations of

futility are no substitute for the 'clear and positive' showing of futility required before suspending the exhaustion requirement."  Bickley, 461 F.3d at 1330.[3]

V.

The motion (Doc. 20) for summary judgment is **GRANTED**.  The Clerk shall enter judgment for the defendant and against the plaintiff and close the case.

ORDERED in Tampa, Florida, on November 10, 2011.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[3] Schwade fails to raise her most promising challenge to the exhaustion requirement.  In 2002 (after Perrino), the Secretary of Labor issued 29 C.F.R. § 2560.503-1(*l*), which states, "[i]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan . . . ." In commentary interpreting the regulation, the Department of Labor asserts that Section 2560.503-1(*l*) replaces the "substantial compliance" test, applied by the majority of the courts of appeals, with a standard under which any infraction, however inconsequential, of the ERISA notice requirement frees a participant to sue his plan.  Pension and Welfare Benefits Administration, ERISA; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed.Reg. 70246-01, 70255-56 (2000).

However, a search reveals no court of appeals that has followed the Department of Labor's discountenance of the "substantial compliance" test for a notice defect.  In fact, since 2002 the Second, Fourth, Fifth, Sixth, and Seventh Circuits have applied the "substantial compliance" standard to the ERISA notice requirement.  See Lacy, 405 F.3d at 256-57; Ponsetti v. GE Pension Plan, 614 F.3d 684, 693 (7th Cir. 2010); Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 87-88 (2d Cir. 2009); Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230, 237 (4th Cir. 2008); Wenner v. Sun Life Assur. Co. of Canada, 482 F.3d 878, 882 (6th Cir. 2007).  A strict compliance standard radically undercuts the aim of the exhaustion requirement, which protects a plan against financial loss from frivolous lawsuits and unnecessary judicial intervention.  See Bickley, 461 F.3d at 1330; see also Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788-89 (4th Cir. 1995); Hozier, 908 F.2d at 1160 (discussing "Congress's concern with minimizing employers' [ERISA] compliance costs").  The Department of Labor's interpretation is probably entitled to no deference, see Goldman v. Hartford Life and Acc. Ins. Co., 417 F.Supp.2d 788, 803-05 (E.D. La. 2006), but even with deference, the strict compliance standard is apparently unendorsed, probably unreasonable, and certainly rejected.